# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES COMMODITY
FUTURES TRADING COMMISSION,**
                    **Plaintiff,**

**-vs-**                                                    **Case No.  6:09-cv-508-Orl-28DAB**

**CAPITAL BLU MANAGEMENT, LLC; DD
INTERNATIONAL HOLDINGS, LLC;
DONOVAN DAVIS JR.; BLAYNE DAVIS;
and DAMIEN BROMFIELD,**
                              **Defendants.**
_____

## ORDER

The three individual Defendants in this case, Donovan Davis Jr. ("D. Davis"), Damien Bromfield ("Bromfield"), and Blayne Davis ("B. Davis") (collectively "the Individual Defendants"), are intelligent young men who come from successful and supportive families. They shared a common goal—to get rich quickly.  These men were so driven to attain this goal that they were willing to violate the law to do so.  They misappropriated money entrusted to them by investors, including friends and family members; they issued false statements deceiving those investors; and they illegally commingled invested funds—all in violation of the Commodity Exchange Act ("the CEA" or "the Act").[1]  The question now pending is what equitable remedies should be imposed to redress these violations.[2]

---

[1]7 U.S.C. § 1 et seq.

[2]The pertinent filings now before the Court are:  Plaintiff's Memorandum in Support of Relief Requested Against Defendants Damien Bromfield and Donovan Davis Jr. (Doc. 315); Defendant Donovan Davis Jr.'s Memorandum in Opposition (Doc. 316); Defendant Damien Bromfield's Post-Trial Memorandum Concerning Available Remedies (Doc. 318);

## I.  Procedural Background

The United States Commodity Futures Trading Commission ("the Commission") brought this action in March 2009, alleging that Capital Blu Management, LLC ("Capital Blu"), through its principals and controlling persons D. Davis (individually and as owner of DD International Holdings, LLC ("DDIH")), Bromfield, and B. Davis, violated the anti-fraud provisions of the CEA and applicable federal regulations.[3]   The Commission alleged numerous instances of misappropriation, issuance of false account statements, and commingling of funds, each of which was alleged to be a separate and distinct violation of the CEA.

Defendants Capital Blu, DDIH, and B. Davis were each served with the Complaint, but they failed to file a responsive pleading.  Defaults were entered against all three.  (Docs. 46, 101, & 275).  The case proceeded to trial against D. Davis and Bromfield.  Based on evidence produced at trial, the jury returned a verdict finding that D. Davis and Bromfield committed the following violations of the CEA:  Count One—Fraud in Connection with On-Exchange Futures (7 U.S.C. § 6b(a)(2)(i)-(iii)); Count Two—Fraud in Connection with Off-Exchange Foreign Currency Contracts (7 U.S.C. § 6b(a)(2)(A)-(C)); Count Three—Fraud in Connection with Foreign Currency Options (7 U.S.C. § 6c(b) and 17 C.F.R. § 32.9(a)-(c));

_____

Notice of Supplemental Authority (Doc. 321) filed by Plaintiff; and Application for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalty, and Ancillary Equitable Relief Against Defendants Capital Blu Management, DD International Holdings and Blayne Davis (Doc. 322).

[3]The original Complaint (Doc. 9) contained six counts; however, in the First Amended Complaint (Doc. 269), one of the counts was eliminated.

and Count Four—Commodity Pool Fraud (7 U.S.C. § 6*o*(1)).  The jury found that D. Davis

and Bromfield committed each of these violations both directly and as controlling persons

of Capital Blu.  Additionally, on Count Five, the jury found that Capital Blu was a commodity

pool operator, that Capital Blu violated 17 C.F.R. § 4.20(b) or (c), and that D. Davis and

Bromfield were controlling persons of Capital Blu.

Following the jury trial, a hearing was set before the Court to consider equitable

remedies sought by the Commission.  Defendants D. Davis and Bromfield were given an

opportunity to present evidence regarding the appropriateness of the relief sought by the

Commission, but they waived the right to do so.  Additionally, pursuant to Federal Rule of

Civil Procedure 55(b)(2) the Commission submitted its Application for Entry of Default

Judgment (Doc. 322) against the defaulted Defendants—Capital Blu, DDIH, and B. Davis

—seeking equitable relief against those Defendants as well.  Having considered the

evidence presented at trial, the filings of record, and the arguments of counsel, I conclude

that the Commission's request for equitable relief should be granted against all Defendants

in the form of an injunction, restitution, and civil monetary penalties.

## II.  Factual Summary[4]

In mid-2006, Bromfield and B. Davis were introduced to one another in a social

context.  At that time, B. Davis was trading in foreign currency contracts ("forex"), and

Bromfield was the information technology director at a software company.  Bromfield was

---

[4]The facts of the case as presented at trial are fairly and accurately summarized in
the Commission's Memorandum (Doc. 315).  I have adopted much of the Commission's
description of the facts in this Summary.

intrigued with B. Davis's work and expressed an interest in engaging in the currency trading business.  In January 2007, Bromfield and B. Davis went into business with each other and formed Capital Blu.

In the beginning, Capital Blu sold a subscription service to people engaged in forex trading, providing information and recommendations.  Very soon thereafter, Capital Blu began offering a managed account service; customers would deliver funds to Capital Blu with the intention that Capital Blu would invest those funds on their behalf.  After the business began offering the managed account service, D. Davis, who had recently sold his successful tile business, became an early investor in Capital Blu.  In August 2007, D. Davis became a co-owner and manager of Capital Blu.  Upon D. Davis joining the company, Capital Blu moved its main office to Melbourne, Florida, where D. Davis was well-known. The three owners of Capital Blu assigned themselves areas of responsibility—D. Davis handled investor relations, Bromfield took care of back office operations, and B. Davis engaged in forex trading.

About the time Capital Blu opened its Melbourne office, the owners decided to establish a forex investment fund.  With that in mind, Defendants retained a law firm, the Investment Law Group, "to represent [Capital Blu] with respect to establishing an investment fund focused on the forex markets and with regard to handling ongoing investment management related legal matters."  (See Pl.'s Trial Exs. 634-35). The Investment Law Group drafted a Private Placement Memorandum ("the PPM") and a Limited Partnership Agreement for an investment fund—CBM FX Fund, LP ("the FX Fund").  The PPM stated that Capital Blu, the general partner of the FX Fund, was "owned and presided by" D. Davis

and Bromfield.  (See PPM, Pl.'s Trial Ex. 637, at 18).  Once the FX Fund was established,
the Capital Blu managed account customers—at the suggestion of Defendants—simply
rolled their accounts over into the FX Fund.

Initially, the business went very well, attracting investors from Melbourne and
elsewhere.  Some of the investors were wealthy and sophisticated, while others were trying
to manage modest retirement plans and a few were young people trying to get a good
financial start in life.  To encourage potential FX Fund investors ("Participants"), the
Individual Defendants explained that only 20% of an investment in the Fund would be at risk.
They also boasted that Capital Blu, from its inception in January 2006, had consistently
earned profits; in fact, however, Capital Blu did not even exist until January 2007.

In January 2008, the FX Fund took a drastic downward turn, losing $1.8 million.
Knowing of the loss, Defendants falsely issued a statement reporting that the FX Fund had
enjoyed a 1.6% gain.  This was done to conceal from Participants that the FX Fund had
experienced a loss in excess of the 20% Defendants had represented was at risk.  Things
got worse in February 2008, and D. Davis and Bromfield caused another false statement to
be sent to the Participants.  About that time, Bromfield coined the term "the gap" to refer to
the difference between the value reported to the Participants and the actual value of the FX
Fund account.  Once the FX Fund began losing money, Defendants used FX Fund money
to pay the operational expenses of Capital Blu.  Although trading improved and the FX Fund
earned profits in April, May, and June 2008, "the gap" persisted and Defendants continued
to send false reports to Participants.  In August 2008, the FX Fund sustained substantial
losses, and Defendants decided to "lock up" the FX Fund, meaning that the participants

could not redeem their investments.  By this time, the Participants had lost much of what they had invested.  After one of the Participants contacted the National Futures Association ("NFA") about Capital Blu, the NFA conducted a surprise onsite audit at the Melbourne office of Capital Blu in September 2008, after which Capital Blu ceased doing business.

### III.  Equitable Remedies Under the CEA

A district court has broad discretion in determining equitable remedies to be imposed upon a finding of violation of the CEA.  Indeed, "the unqualified grant of statutory authority to issue an injunction under [7 U.S.C.] §13a-1 carries with it the full range of equitable remedies."  CFTC v. Wilshire Inv. Mgmt. Corp., 531 F.3d 1339, 1344 (11th Cir. 2008).  Included within that range of equitable remedies "is the power to grant restitution."  Id.  In addition to injunctive relief and restitution, the CEA authorizes imposition of civil monetary penalties.  7 U.S.C. § 13a-1(d).  The Commission seeks all three of these remedies in this case.

Before addressing each of these three remedies specifically, the contention of D. Davis and Bromfield that their liability—and consequently, their obligation to make restitution and pay civil monetary penalties—is mitigated because of the wrongful conduct of others requires discussion.  This argument permeated this litigation and is now again raised with regard to what, if any, equitable remedies should be imposed.

First, D. Davis and Bromfield assert that they are less culpable for their own wrongful conduct because their partner, B. Davis, diverted funds that otherwise would have gone to Capital Blu.  Without access to the funds diverted by B. Davis, Capital Blu could not pay its operating expenses, including the salaries of D. Davis and Bromfield.  To make up for the

shortfall, D. Davis and Bromfield used funds of Participants in the FX Fund to pay Capital Blu operating expenses.

Additionally, D. Davis and Bromfield contend that their responsibility is diminished because of the conduct of Lewis Freeman ("Freeman"), whom I appointed to serve as receiver at the inception of this case, (see Order, Doc. 8). In his capacity as receiver, Freeman was charged with taking possession of Capital Blu property for the benefit of victims. Freeman's resumé indicated that he was an attorney with vast experience as a receiver. His work had earned him the trust of the bench and bar in south Florida, from which he hailed. As it turned out, confidence in Freeman was severely misplaced. He stole from estates with which he had been entrusted, including that of Capital Blu. During the pendency of this case, he was convicted in the Southern District of Florida of criminal wrongdoing and has been sentenced to prison, though the offenses for which Freeman was prosecuted and sentenced did not involve his conduct with regard to Capital Blu.

Bromfield and D. Davis have also attempted to blame Freeman for missing Capital Blu computers. However, evidence was presented that either Bromfield or D. Davis directed that those computers be delivered to the office of D. Davis's attorney in downtown Orlando, but the attorney never received them. The mysterious disappearance of the computers has never been solved, but the Court cannot conclude that either Freeman or counsel for the Defendants is responsible for their loss.

These Defendants' argument that they are less culpable because of the wrongful conduct of others is unavailing. B. Davis's diversion of funds does not excuse the fraud perpetrated by them, and for the purposes of determining what equitable relief is to be

granted, the Defendants have already been given credit for the funds stolen by Freeman. Davis and Bromfield are being held accountable for their own wrongful conduct and nothing more.

### A.  Injunctive Relief

The Commission requests sweeping injunctive relief.  Among other things, it asks that the Defendants be enjoined from ever again engaging in "activity related to trading in any commodity."  (Doc. 315 at 24).  The Commission also seeks to enjoin Defendants from "trading any commodity interest for themselves or on behalf of any other person or entity" and "from soliciting, receiving, or accepting any funds in connection with the purchase or sale of any commodity interest contract."  (Id.).  Additionally, the Commission asks that Defendants be enjoined "from engaging in any business activities related to commodity interest trading."  (Id.).

D. Davis and Bromfield do not seriously argue that injunctive relief is inappropriate, but they contend that the terms of the injunction requested by the Commission are overreaching in breadth.  They argue that the request that they be enjoined forever is unnecessarily severe.  Also, they complain that they should not be prohibited from trading on their own as long as they use only their own money.  These Defendants request that injunctive relief, if deemed appropriate, be limited to the extent necessary to address the risks they present.

The Commission may obtain injunctive relief upon a showing that the CEA has been violated and that future violations are likely unless enjoined.  CFTC v. Sidoti, 178 F.3d 1132, 1137 (11th Cir. 1999).  In analyzing the second part of this test—that future violations are

-8-

likely—the district court may infer likelihood of future violations from a defendant's past violations.  CFTC v. Am. Bd. of Trade, Inc., 803 F.2d 1242, 1251 (2d Cir. 1986).  Such inferences are appropriate in certain cases because the number and manner in which past violations have occurred may be an indication that future violations will occur if injunctive relief is not granted.  In the instant case, the Commission correctly notes that even though the violations by the Individual Defendants were egregious and recurrent, D. Davis and Bromfield have failed to recognize the wrongful nature of their conduct.  These factors weigh significantly in favor of imposition of a permanent injunction.  See CFTC v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979).

Defendants' conduct makes it clear that extensive injunctive relief is required. Although the Defendants present varying degrees of risk, significant restrictions on future conduct are required as to each.  From the testimony offered in this case, the Court has learned that B. Davis committed violations of the law prior to the formation of Capital Blu, and he has been found guilty on three of five charged counts of criminal wire fraud[5] in a case before another judge in this district.   He is currently awaiting sentencing for those convictions.  B. Davis presents a great risk of violating the law in the future.  Injunctive relief severely limiting his future conduct is required.

Comprehensive injunctive relief is also necessary to restrict the activities of Bromfield. His violations were manifold and were designed to deceive investors.  Much was revealed by Bromfield's trial testimony.   Notwithstanding overwhelming evidence against him,

_____

[5]18 U.S.C. § 1343.

Bromfield maintains his innocence, not acknowledging the significance of his wrongful conduct. His persistent denial of wrongdoing was undertaken with intent to deceive the jury. Even after the Capital Blu venture had been closed down by the NFA, he embarked on the establishment of another forex-related business. There is a serious risk that absent restrictions, Bromfield would again engage in similar fraudulent conduct.

Less is known about D. Davis because throughout this case he invoked his Fifth Amendment right not to testify. There was evidence that he became distraught when the business began to unravel, but it is not clear that his anxiety was based on his concern for other investors as opposed to his own losses and those of his family. Although D. Davis comes from a wealthy and generous family, his attorney suggests that he is unemployed and has no legitimate means of making a living. D. Davis has produced no evidence to mitigate concerns that he would reoffend.

In sum, all three of the Individual Defendants engaged in egregious conduct. They committed repeated fraudulent acts for which they have shown no remorse. They caused fraudulent statements of investor accounts to be issued over a period of eight months, and they wrongfully used the funds of investors for the benefit of Capital Blu and themselves. They continue to blame one another, the former receiver, and even one of the investors for their own actions. These circumstances require imposition of stringent injunctive relief against all Defendants for the protection of the public, and a permanent injunction shall be entered.

B.  Restitution

The Commission seeks restitution of $2,463,592.12 from the Defendants. The

Eleventh Circuit Court of Appeals has repeatedly held that the equitable remedy of restitution under the CEA "does not take into consideration the plaintiff's losses[] but only focuses on the defendant's unjust enrichment." Wilshire, 531 F.3d at 1345. Thus, "[t]he proper measurement [of restitution] is the amount that [the defendants] wrongfully gained." Id.; accord CFTC v. Levy, 541 F.3d 1102, 1113 (11th Cir. 2008) (noting that the defendant "can only be liable in restitution to the extent of his unjust enrichment" (citing Wilshire)).

The Commission has correctly calculated the amount of restitution with a straightforward arithmetical computation.  Starting with the amount in the FX Fund account in January 2008, the Commission then added the amount of investor money paid into the FX Fund by participants from January 2008 to September 2008.  The resulting amount was the total sum contributed by FX Fund Participants.  From that total, the following were subtracted:  amounts redeemed by Participants between January 2008 and September 2008; fee and expense reimbursements to which Defendants were entitled; the amount lost in trading; and the funds on hand in the FX Fund as of September 30, 2008.  The remainder—$2,463,592.12—is what Defendants used to pay Capital Blu operating expenses, including payments they made to themselves or otherwise used for their own purposes.

D. Davis and Bromfield argue that there should be further reduction in the requested amount of restitution based upon their payment of legitimate Capital Blu business expenses. Included in the request for reduction is $20,000 in legal fees paid in an effort to remove B. Davis as a Capital Blu partner.  The question is not whether the Capital Blu expenses were legitimate, as the expense for removing B. Davis very well may have been; rather, the

question is whether the Capital Blu expenses were paid using FX Fund money.

It was improper for Defendants to use FX Fund monies to pay legal fees or any other Capital Blu operating expense, and Defendants are responsible for such monies—whether they went toward legitimate Capital Blu expenses or not.  The Individual Defendants were the owners of Capital Blu and totally controlled the conduct of its business.  Capital Blu paid the Individual Defendants' salaries and provided them with other benefits, and the Individual Defendants obviously gained from keeping Capital Blu afloat.  In every respect, the Individual Defendants were the beneficiaries of the funds wrongfully taken from the FX Fund.  Under these circumstances, Defendants cannot claim that they were not enriched by the monies taken from the FX Fund and used to pay Capital Blu operating expenses, nor can they claim that they should not now be responsible for repayment.

D. Davis makes the additional argument that the amount of restitution should be reduced by $900,000—the amount invested by members of his family.  In other words, D. Davis is claiming a credit for the total amount of losses endured by members of his family who invested in his business.  In support of this argument, he points out that some members of his family invested with Capital Blu before he had an ownership interest in the entity; that his family members' contribution was substantial; and that his salary from Capital Blu was not excessive.  This argument is without merit.  As emphasized by the Commission, applying a credit as requested would create a separate class of creditors comprised of D. Davis's family members who would not share their loss proportionately with other investors.

D. Davis and Bromfield also contend that they should not be jointly and severally liable for over $800,000 stolen by B. Davis.  This sum includes commissions of over

$600,000 due Capital Blu that B. Davis secretly diverted for his own benefit.  Also included is a fee of over $200,000 that B. Davis paid to his criminal defense attorney using Capital Blu funds.  These sums were taken from Capital Blu and not the FX Fund.  While D. Davis and Bromfield may have a cause of action against B. Davis for misappropriating Capital Blu funds, that has nothing to do with Defendants' obligation to pay restitution in this action brought by the CFTC.

The Defendants should be held jointly and severally liable for restitution.  Acting in concert with one another, they caused harm to FX Fund Participants and unjustly enriched themselves.  The Defendants have failed to advance a reasonable basis for apportionment of liability, and the Court finds no basis for doing so.  "'[W]here joint tortfeasors cause a single and indivisible harm for which there is no reasonable basis for division according to the contribution of each, each tortfeasor is subject to liability for the entire harm.'"  United States v. Alcan Aluminum Corp., 964 F.2d 252, 268-69 (3d Cir. 1992) (quoting Restatement (Second) of Torts § 881).

In sum, the Defendants will be ordered to pay restitution in the amount computed by the Commission—$2,463,592.12.  The Defendants shall be held jointly and severally liable for this sum.[6]

---

[6]The Commission also requested that prejudgment interest be added to the restitution award.  However, the Commission did not set forth a basis for such an award of prejudgment interest, which is within this Court's discretion.  See, e.g., CFTC v. Schafer, No. C.A. H-96-1213, 1999 WL 33650356, at *7 (S.D. Tex. May 28, 1999); cf. SEC v. Huff, 758 F. Supp. 2d 1288, 1363 (S.D. Fla. 2010).  Under the circumstances of this case and in light of the fact that restitution is awarded in this circuit in the amount of the Defendants' unjust enrichment rather than the amount of the victims' loss, prejudgment interest will not be added to the restitution amount.

C.  Civil Monetary Penalty

In addition to an injunction and an order of restitution, the Commission seeks imposition of a civil monetary penalty of $8 million against D. Davis Jr., B. Davis, Bromfield, and DDIH.[7]   The CEA provides that "[i]n any action brought under this section, the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation . . . a civil penalty in the amount of not more than the greater of [$130,000][8] or triple the monetary gain to the person for each violation."  7 U.S.C. § 13a-1(d)(1)(A).  The Commission may, as it has done in this case, allege multiple violations in a single count.  Levy, 541 F.3d at 1110-11.  For purposes of calculating monetary penalties, each of the multiple violations contained in a single count is considered separately.  Id. at 1111-12.

Defendants waived their right to a jury trial as to the number of times they violated the Act, leaving that calculation to the Court.  In its Memorandum in Support of Relief (Doc. 315), the Commission summarizes the evidence and explains its conclusion that Defendants were responsible for 552 violations.  The Commission details the issuance of 524 false account statements between January 2008 and August 2008 and 26 distinct acts of misappropriation.  These violations were established in accordance with the allegations contained in Counts I through IV of the Amended Complaint.  The Commission also established two violations

---

[7]The Commission did not include Capital Blu in the civil penalty portion of its proposed order, though Capital Blu was included in the injunction and restitution portions.  (See Proposed Order, Ex. B to Doc. 322).  Accordingly, a civil penalty will not be imposed on Capital Blu.

[8]See 17 C.F.R. § 143.8.

-14-

via Capital Blu's commingling of the funds of FX Fund Participants as alleged in Count V of the Amended Complaint. The maximum monetary penalty available under the CEA for these 552 violations is $71,760,000.

A district court is not obligated to impose the maximum monetary penalty available under the Act. Instead, the penalty must be "rationally related to the offense charged or the need for deterrence." Id. at 1112. In applying this standard, it is appropriate to take into account "the general seriousness of the violation[s] as well as any particular mitigating or aggravating circumstances that exist." Wilshire, 531 F.3d at 1346. Factors that may be considered include: "(1) the relationship of the violation at issue to the regulatory purposes of the Act; (2) [the defendant]'s state of mind; (3) the consequences flowing from the violative conduct; and (4) [the defendant]'s post-violation conduct." R&W Technical Servs. Ltd. v. CFTC, 205 F.3d 165, 177 (5th Cir. 2000).

Proportionality is central in determining an appropriate monetary penalty—the most serious penalties should be reserved for the most serious offenders. The Commission has gone some distance in recognizing the importance of proportionality in determining monetary penalties, seeking $8 million in relief instead of the statutory maximum of in excess of $71 million. The $8 million penalty requested by the Commission is approximately equal to the sum of the $2.4 million misappropriated by Defendants and the $5.6 million lost in FX Fund trading.

### 1. Relationship of Violation to the Regulatory Purposes of the CEA

Defrauding customers has been recognized as violative of "'core provisions of the [CEA's] regulatory system'" and "'should be considered very serious even if there are

mitigating facts and circumstances.'" JCC, Inc. v. CFTC, 63 F.3d 1557, 1571 (11th Cir. 1995) (quoting In re Premex, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,165 at 34,890 to 34,891 (CFTC Feb. 17, 1988)) (emphasis removed).   Defendants' violations in this case thus attack the core of the protective purpose of the CEA, and this factor weighs in favor of imposition of a significant civil monetary penalty.

     *2. Defendants' State of Mind*

     Defendants knowingly engaged in a course of conduct designed to deceive investors. From the time the FX Fund was established, they lied to potential participants by telling them that at no time would more than 20% of their investment be at risk.   They also provided material stating that Capital Blu's managed accounts had consistently earned profits from January 2006, when in fact the company did not even exist until January 2007.   When the FX Fund experienced a loss in January 2008, the Defendants elected to embark on a course of conduct designed to hide the losses and keep Capital Blu afloat using FX Fund money to pay the salaries of the Individual Defendants and provide them with amenities, including the use of a private jet airplane.   This pattern of fraud continued until August 8, 2008, when the FX Fund experienced a loss of millions of dollars.   By that time, Defendants had made 26 transfers of FX Fund Participants' money to Capital Blu—misappropriating in excess of $2.4 million—and on at least two occasions, they transferred money belonging to Participants into trading accounts in the name of Capital Blu, constituting deliberate commingling of funds.

     As the end neared, D. Davis saw to it that his mother was issued a $125,000 redemption of her investment in the FX Fund.   Worried that other investors would demand

redemption of their investments, D. Davis and Bromfield executed Bromfield's preconceived plan to impose a "lock up" of Participants' funds, meaning that Participants would be barred access to their funds.  On September 3, 2008, D. Davis and Bromfield posted a letter on the Capital Blu website advising investors that a four-month lock up had been put in place.  That same day, they issued a statement reporting a .16% gain in the FX Fund, knowing full well that the report was false.

Although D. Davis and Bromfield are in some respects unsophisticated, they clearly understood the fraudulent nature of their conduct.  The distance they went to deceive is relevant in assessing an appropriate civil penalty.  When they became aware of the $1.8 million loss in January 2008, D. Davis instructed Capital Blu's controller to report a gain.  When the controller objected, D. Davis instructed her to speak to Bromfield.  Bromfield told the controller that he and D. Davis had a plan to put money back into the FX Fund.  When the January report issued, it falsely reported a 1.6% gain.  The controller, a certified public accountant, persisted in expressing her concern about lying to Participants and using Participants' money to pay operational expenses of Capital Blu.

To placate the controller, Bromfield offered to place a conference telephone call to Brent Gillett, a lawyer with the Investment Law Group.  During the resulting March 7 conference call, Gillett made it clear that reports to Participants should be accurate and that Capital Blu could not use FX Fund money to pay for Capital Blu operations.  Gillett underscored the seriousness of the question by advising that he had a client who had been sent to prison for using client funds to pay for operating expenses.  Upon learning of the contents of the conversation with Gillett, D. Davis explained to the controller that "we're

money managers, not like" the lawyers at the Investment Law Group.  He explained to the controller that "if people entrusted him with money, it was his to do whatever he thought with" and he did not have to "follow the rules."  The controller then objected to the use of the false reports to induce new Participants to invest in the Fund.  In response to the objection, D. Davis lied and stated that the false reports were not included in the marketing material.  The controller, knowing the statement to be false, resigned her position with Capital Blu.

After the controller resigned, D. Davis and Bromfield hired Carissa Douglas, D. Davis's cousin, to help with the accounting.  Defendants did not share information with Douglas as they had with the controller; instead, they made a focused effort to keep information from her, including the fact that they were using FX Fund money to pay for Capital Blu operating expenses.  Bromfield sent an email to D. Davis and B. Davis instructing them not to "talk to [Douglas] about the mechanics or the workings of how to [sic] we take money from fund account etc."  (Pl.'s Trial Ex. 531A).  Bromfield explained in that email that he had "already laid out a solid functional reasoning" but that Douglas was "a smart girl and asks smart questions."  (Id.).  The decision to secrete information from Douglas was made in furtherance of Defendants' efforts to perpetuate their fraudulent conduct and reveals Defendants' understanding of their wrongdoing.

The state of mind of D. Davis and Bromfield is further revealed by two email messages Bromfield sent D. Davis early in the morning on June 27, 2008.  The first was sent at 3:22 a.m. and expressed the urgency of getting "the numbers" to "stand up to the analysis."  (Pl.'s Trial Ex. 581).  Included in that message was a link to an indictment issued by the Colorado Attorney General; the Colorado indictment contained alleged facts almost

identical to those in this case.  The defendants in the Colorado case were accused of having

operated a hedge fund as a limited partnership, using investors' money to pay their operating

expenses, issuing false statements to investors, and improperly investing in a jet airplane.

The second email message, sent at 3:44 a.m., described the importance of getting the

business in order within the ensuing three months.  (See Pl.'s Trial Ex. 582).  Bromfield

wrote:  "I almost think we should sell the jet and get rid of that 50k a month bill."  (Id.).

*3. Consequences Flowing from the Violative Conduct*

It is this factor more than any other that drives the Commission's demand that the civil

monetary penalty set at $8 million.  As noted earlier, $5.6 million of that sum represents the

amount lost in trading during the period that Defendants engaged in fraudulent conduct, and

the other $2.4 million is the amount of FX Fund money misappropriated by Defendants.  The

Commission's suggestion is problematic, however, because there is no way of accurately

determining how much of the $5.6 million loss was due to Defendants' malfeasance.  It is

reasonable to conclude that had Defendants been honest in their representations to

Participants, many Participants would have redeemed their investments and many others

would not have made an investment in the first place, but it is not reasonable to conclude

that full and honest disclosure by Defendants would have resulted in no loss.  Common

sense leads me to believe that some market-related losses likely would have occurred

regardless of Defendants' conduct.

Imposing a monetary penalty of $8 million would satisfy the element of deterrence,

but I am not satisfied that that amount is sufficiently related or proportional to the conduct of

Defendants.   Nonetheless, the consequences of Defendants' conduct borne by the

Participants in the FX Fund require imposition of a significant civil monetary penalty.

### 4. Post-Violation Conduct

Defendants' regard for the interests of investors was secondary to their concerns for the survival of Capital Blu and avoiding accountability for their own conduct.  Instead of disclosing the truth about the FX Fund, they elected to progressively heighten the level of their wrongful conduct in misleading innocent investors.  D. Davis and Bromfield have blamed B. Davis and the receiver for all that went wrong.  There has been no trace of contrition on their part.

D. Davis exercised his right not to testify during the course of these proceedings, but Bromfield waived that right.  His lengthy testimony was vague and disingenuous, but it revealed a level of intelligence that is inconsistent with a failure to understand the wrongful nature of his conduct.  It is my conclusion that both D. Davis and Bromfield appreciated the illegality of their conduct, but they persisted.  Defendants' failure to accept responsibility is troubling and weighs in favor of severe sanctions.

### 5. Mitigating Circumstances

D. Davis and Bromfield argue that some circumstances weigh in favor of leniency toward them.  These two Defendants were young, somewhat naive, and too trusting of B. Davis, who apparently used his considerable charisma to gain their confidence and that of numerous others.  B. Davis not only went into competition with D. Davis and Bromfield, but he also diverted funds to which Capital Blu was entitled.  D. Davis and Bromfield suggest that but for B. Davis's diversion of funds intended for Capital Blu, D. they would have been better able to close "the gap" and ultimately mitigate losses incurred by FX Fund

Participants.  However, in executing the plan to close "the gap" in the first instance, D. Davis and Bromfield were already deceiving Participants—issuing false statements in order to hide the FX Fund's losses and the fact that they had used FX Fund resources to pay Capital Blu operating expenses.  On the other hand, notwithstanding the $15,000 per month income and other benefits that they enjoyed in part as a result of using FX Funds to pay Capital Blu expenses, neither D. Davis nor Bromfield received large amounts of cash.  Moreover, there is no evidence that any of the Defendants currently owns significant assets.

    *6.  Conclusion as to Civil Penalty*

    A civil monetary penalty should be reasonably related and proportional to the illegal conduct of Defendants, but because the remedy is punitive, it also should be carefully measured.  The penalty should be sufficient but not harsher than necessary to meet the goals of relatedness, proportionality, and deterrence.   Considering the totality of the circumstances, I find that a civil monetary penalty of $4,927,184.24, an amount equal to twice the Defendants' gain, meets that test.  Cf. CFTC v. Equity Fin. Group LLC, 537 F. Supp. 2d 677, 700 (D.N.J. 2008) (concluding that the egregious nature of the defendants' conduct warranted imposition of civil monetary penalties of double the amount of the defendants' gains).  Each Defendant except Capital Blu[9] will be ordered to pay a penalty in this amount.

IV.  Conclusion

    In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that the

_____

    [9]See n.7 supra.

Commission's request for a permanent injunction, restitution, and civil monetary penalties against all Defendants, including its pending Application for Entry of Default Judgment (Doc. 322) is **GRANTED**.  All other pending motions are **DENIED as moot**.  The Clerk is directed to enter judgment in accordance with this Order in the form attached hereto, which the Court hereby approves pursuant to Federal Rule of Civil Procedure 58(b)(2).  Thereafter, the Clerk shall close this file.

      **DONE** and **ORDERED** in Orlando, Florida this 9th day of June, 2011.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party